STATE of Alaska, DEPARTMENT OF COMMERCE, COMMUNITY & ECONOMIC DEVELOPMENT, DIVISION OF CORPORATIONS, BUSINESS & PROFESSIONAL LICENSING, and Board of Certified Real Estate Appraisers, Appellants and Cross–Appellees,

v.

Kim WOLD, Appellee and Cross–Appellant.

Nos. S–13901, S–13952.

Supreme Court of Alaska.

May 18, 2012.

Rehearing Denied June 18, 2012.

Robert C. Auth, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellants/Cross–Appellees.

Bruce E. Falconer, Boyd, Chandler & Falconer, LLP, Anchorage, for Appellee/Cross–Appellant.

Before: CARPENETI, Chief Justice, FABE, and STOWERS, Justices.

*OPINION*

CARPENETI, Chief Justice.

## I. INTRODUCTION

In 2008, Alaska's Board of Certified Real Estate Appraisers imposed professional sanctions on an appraiser for violations of the Uniform Standards of Professional Appraisal Practice (USPAP). The Board relied in large part on the views of a distinguished expert in Alaskan real estate appraisal who performed a "desk review" of the appraiser's work. The expert concluded that the appraiser committed numerous violations of the USPAP. Though we review the Board's findings with great deference, we conclude that none of the Board's findings of USPAP violations were supported by substantial evidence in light of the whole record. We thus affirm the superior court's reversal of the Board's findings of USPAP violations, and reverse the single violation that the superior court affirmed.

## II. FACTS AND PROCEEDINGS

### A. Facts

Kim Wold has been certified in Alaska as a general real estate appraiser since 1991. Three of Wold's appraisals are the subject of this case:

(i) the appraisal of a residential property at 315 Copper Road in Ketchikan, (the "Copper Road" property), which Wold completed in 1997 and supplemented in 1998;

(ii) the appraisal of a partial interest in Entwit's Float, a marina facility in Ketchikan (the "marina" property), which Wold completed in 1998; and

(iii) the appraisal of a luxury residential property on Ellis Island in Ketchikan (the "Ellis Island" property), which Wold completed in 2002.

### 1. The Copper Road (1997, 1998) and marina (1998) appraisals

Both the Copper Road appraisal and the marina appraisal were prepared by Wold for use in the divorce proceedings between Leif Entwit and Linda Entwit. In order to estimate the market value of the Copper Road property, Wold performed an analysis that involved making significant downward adjustments in value to four comparable properties.

After Wold completed his appraisal, Leif Entwit hired a local contractor, Garnet Dima, to inspect the Copper Road residence. Dima found "signs of sagging" in the floor and estimated that correcting the problem would cost $25,000. Wold issued an updated appraisal, lowering his estimate of the property's value from $115,000 to $77,500 based on the cost to cure the sagging floor as well as the risk associated with effecting the cure.

Wold's marina appraisal relied primarily on the "cost approach" to determine valuation. Linda Entwit's attorney hired another appraiser, Julie Dinneen, to review the marina appraisal. Dinneen's review criticized Wold's conclusion that marina improvements reflected "the highest and best use" of the property.[1] Dinneen concluded that Wold had violated the USPAP. She forwarded her review to the Division of Occupational Licensing (the Division).

When the Entwit divorce case went to trial, the court found that the Copper Road property had a value of $132,280 (as opposed to Wold's original estimate of $115,000 and revised estimate of $77,500) and the marina property had a value of $240,293 (as opposed to Wold's estimate of $150,000). The court concluded that Wold "unquestionably took on the role of advocate for Leif's litigation position."

### 2. The Ellis Island appraisal (2002)

Wold prepared the appraisal of the luxury Ellis Island residential property for use in pending litigation between neighbors. Wold again used the cost approach to value the property, arriving at a rounded value of $2,100,000.

The opposing attorneys hired another appraiser, Vince Coan, to review Wold's Ellis Island appraisal. Coan concluded that Wold's appraisal violated various provisions of the USPAP. Coan forwarded his review to the Division.

### B. Proceedings

The Division assembled an investigative file of Wold's work and forwarded it to appraiser Alfred Ferrara for expert review. In his 2003 reports, Ferrara concluded that Wold violated various USPAP rules. In 2004, the Division filed an accusation against Wold with the Board of Certified Real Estate Appraisers. The case was assigned to Administrative Law Judge (ALJ) David G. Stebing, who held hearings in December 2005 and February 2006. Before issuing a proposed decision, ALJ Stebing resigned. ALJ James T. Stanley replaced him.

After receiving and rejecting two proposed decisions by ALJ Stanley, the Board voted to decide the case themselves. The Board took no additional evidence, but both parties had an opportunity to present additional written argument. The Board's final decision and order "agreed with the ALJ's conclusions regarding the facts of the case and the violations proven by the evidence, but altered the license discipline sanctions to more appropriately reflect the seriousness of the offenses and the retraining the Board believes to be necessary." The Board found that Wold had violated the USPAP eight times, but found no violation on eleven other points. The Board imposed sanctions including a formal reprimand, fines, and 109 hours of classroom training at the Appraisal Institute in Chicago, Illinois.

Wold appealed the Board's decision to the superior court in Ketchikan in 2008. On December 14, 2009, following briefing and oral argument, Superior Court Judge Trevor Stephens reversed seven of the Board's eight findings that Wold had violated the USPAP, holding that these findings were not supported by substantial evidence. In May

---

1. The Board ultimately found that Wold's "highest and best use" analysis did not violate the USPAP. The issue is not part of the present appeal or cross-appeal.

2010, the superior court awarded Wold 50% of his reasonable attorney's fees.

The State appeals the superior court's partial reversal of the Board's decision. Wold cross-appeals the superior court's partial affirmation of the Board's decision and the superior court's attorney's fees decision.

## III. STANDARD OF REVIEW

■ As we stated in our first and only other opinion reviewing a decision of the Board of Certified Real Estate Appraisers, "[b]ecause the superior court sat as an intermediate court of appeal, we will independently review the merits of the [B]oard's administrative determination. We review findings of fact in appeals of administrative decisions under the 'substantial evidence' test." [2] "Substantial evidence is 'in light of the record as a whole, ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" [3] "In determining whether evidence is substantial, ... we must take into account whatever in the record fairly detracts from its weight." [4]

■ The substantial evidence test for administrative factual findings has its roots in Alaska's Administrative Procedure Act (APA), which presents the "scope of review" for administrative adjudication as follows:

> The [reviewing] court may exercise its independent judgment on the evidence. If it is claimed that the findings are not supported by the evidence, abuse of discretion is established if the court determines that the findings are not supported by

(1) the weight of the evidence; or

(2) substantial evidence in the light of the whole record.[5]

The Alaska APA applies to the decisions of state boards, including the Board of Certified Real Estate Appraisers.[6]

■ We "use the abuse of discretion standard to review an award of attorney's fees.... Whether the court applied the proper legal analysis to calculate attorney's fees is a question of law we review de novo." [7]

## IV. DISCUSSION

Alaska began licensing real estate appraisers in 1990, after Congress passed legislation in response to abuses in the lending industry that led to the savings and loan crisis in the 1980s. Alaska also adopted the USPAP in 1990.[8] This case is our first review of a disciplinary decision by the Board based on violations of the USPAP; it is also the Board's first use of the USPAP as the basis for such a decision.[9]

The main points on appeal and cross-appeal concern whether the Board's findings that Wold violated the USPAP were supported by substantial evidence.

### A. The Board's Finding That Wold Violated Standards Rule (SR) 1–1(b) In The Copper Road Appraisal Was Not Supported By Substantial Evidence.

Wold created a summary appraisal report for the Copper Road property in 1997. The

2. *Wendte v. State, Bd. of Real Estate Appraisers,* 70 P.3d 1089, 1091 (Alaska 2003) (footnotes omitted).

3. *Lewis–Walunga v. Municipality of Anchorage,* 249 P.3d 1063, 1069 (Alaska 2011) (quoting *Rockney v. Boslough Constr. Co.,* 115 P.3d 1240, 1242 (Alaska 2005)).

4. *Lopez v. Adm'r, Pub. Emps. Ret. Sys.,* 20 P.3d 568, 570 (Alaska 2001) (quoting *Hester v. State, Pub. Emps. Ret. Bd.,* 817 P.2d 472, 477 n. 8 (Alaska 1991) (Rabinowitz, C.J., dissenting)) (internal quotation marks omitted).

5. AS 44.62.570(c).

6. AS 44.62.330(a)(37); *cf. Forth v. N. Stevedoring & Handling Corp.,* 385 P.2d 944 (Alaska 1963) (applying substantial evidence test under Alaska

APA to decision by Alaska Workmen's Compensation Board).

7. *Weimer v. Cont'l Car & Truck, LLC,* 237 P.3d 610, 613 (Alaska 2010) (footnotes omitted).

8. *See* AS 08.87.200(3) (1990).

9. In four memoranda of agreement, the Board has used the USPAP as the basis for imposing disciplinary sanctions. A memorandum of agreement is not a decision because it is not the result of a contested hearing and does not represent a determination of the issues presented. It is a negotiated settlement agreement with a lesser significance than a decision. It yields sanctions or conditions acceptable to the Board, but does not have formal standing under AS 08.01.075(f).

report was commissioned for use in a divorce. In order to determine the value of the Copper Road property, Wold relied partly on the "sales comparison approach." This approach involves deriving a value for the subject property by comparing it to similar properties that have been recently sold, and making adjustments to the sale prices of those properties based on the differences between them and the subject property.[10]

Wold made downward adjustments to the sale prices of four comparison properties in order to arrive at his estimation of the Copper Road property's value, $115,000. Wold's appraisal included an addendum noting, among other disclaimers, that his adjustments "often exceed established appraisal guidelines. This is unavoidable given the limited sales data available."

The Board concluded, based on a review of the evidence related to the Copper Road property:

> Mr. Wold violated SR 1–1(b) when he used comparable sales that required unreasonably high adjustments. For example, the four other residential properties were adjusted downward in value by 27%, 46%, 34% and 23%. All of the four properties were more valuable than the subject property. Inability to bracket [11] a property is a substantial defect in an appraiser's reliance on the sales comparison approach.[12] It may be true that better comparable properties were unavailable; if true, this fact would need to be explained and justified in the report.

Alaska Statute 08.87.200(3) states that a certified real estate appraiser may not fail to comply with the USPAP. Standards Rule 1–1(b) of the 1995 edition of the USPAP stated that an appraiser must "not commit a substantial error of omission or commission that significantly affects an appraisal." [13]

Though the Board offers no further explanation of its conclusions, nor citations to the record, the Board's conclusions echo those of Alfred Ferrara, the State's hired reviewer and principal expert witness. Ferrara testified to having appraised properties in Alaska for over 40 years, to having received the first appraisal license in the state, to having served two terms as chair of the Board, and to being a designated member of the Appraisal Institute, which produces *The Appraisal of Real Estate*, a book that both parties cite frequently and that Wold recognized as the "Bible" of the profession.

Ferrara's written review of the Copper Road appraisal states the following:

> It is typical and virtually required in residential appraisal practice in Alaska and other states that the value of a property is bracketed with homes which have sold at prices both above and below the final concluded value. It is unreasonable to assume that no other sales in Ketchikan below $145,000 were available for comparison to the subject. If that were the situation, then it may be that residential properties do not normally sell for as low a price as $115,000 and the appraisal is misstated.
>
> The adjustments themselves are exceedingly large and not adequately explained in the report. The discussion of the adjustments in the addenda states adjustments were derived from paired sales analysis . . . however no such analysis was included in the appraisal. . . .
>
> . . . .
>
> In summation, the sales used in the report do not appear to be representative of transactions which would be competitive to the subject in the Ketchikan market and aside from sale 4, are not likely the sales that would be used by most appraisers in valuing this property. It is doubtful that

---

**10.** *See* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 297 (13th ed. 2008) (defining sales comparison approach).

**11.** As the Board's decision notes, "bracketing" means "using comparable properties with value both above and below the subject property." *See also* APPRAISAL INSTITUTE, *supra* note 9, at 321 (defining bracketing).

**12.** The Board's decision cites here to *Snowbank Enters., Inc. v. United States*, 6 Cl.Ct. 476, 485 (Cl.Ct.1984), a pre-USPAP decision.

**13.** The Board's decision misquotes SR 1–1(b) (1995) as prohibiting "a substantial error *or* omission or commission." (Emphasis added.)

these sales are indicative of the subject[']s value particularly due to the large and questionable adjustments made in several of the categories. *This results in an appraisal which does not appear to fairly represent the value of the property and which is misleading.*

Ferrara provides no citations to the appraisal literature nor to Alaska real estate market data in support of his conclusions. Ferrara's written review explicitly notes that Ferrara did not inspect the subject property. During Ferrara's oral testimony on the Copper Road appraisal, he stated that he performed a "desk review," which is "a review of the paperwork that's been submitted to the appraisal and the supporting data." Ferrara later stated that the purpose of such reviews is to determine whether an appraisal is convincing "on its face."

Ferrara's oral testimony on the Copper Road appraisal reflected and expanded on the contents of his written review. He conceded on cross-examination that he did not search the market for better comparables and had no personal information regarding the existence of any such properties. But he continued to insist that it would be "unreasonable" and "illogical" for no sales to have occurred in Ketchikan during the relevant time period for under $115,000.

Despite Ferrara's reservations, he testified that if the choice had been his, he would not have filed a complaint with the Division based on the Copper Road appraisal.

■ The Board's decision raises two issues, which we address in turn. First, the Board stated that "Mr. Wold violated SR 1–1(b) when he used comparable sales that required unreasonably high adjustments." The Board's reasoning in this statement depends on there having been better comparables than the ones used by Wold. But Ferrara's speculation that such comparables

must have existed as a matter of logic or reason is not a sufficient basis for a reasonable mind to conclude that such comparables did exist as a matter of empirical fact.[14] To the extent that the Board's finding that Wold violated SR 1–1(b) in the Copper Road appraisal was based on Wold's use of inappropriate comparable sales, we reverse that finding for a lack of substantial evidence.

■ Second, the Board's decision recognizes the possibility that better comparable properties may not have been available, but states that "if true, this fact would need to be explained and justified in the report." Wold's addendum does, in fact, address the lack of better comparables. Moreover, the Board made clear that it considered Wold's addendum and found it "adequate to allow the intended user to understand his valuation." The Board's decision provides no analytical basis for concluding that Wold's addendum to the Copper Road appraisal provided an inadequate explanation of his choice of comparables.

Turning to the record as a whole, we note that Ferrara dismissed the explanation in Wold's addendum as "what we typically call a boiler plate," something that would "probably be in every appraisal that [Wold] performs in the community." As Judge Stephens noted, Ferrara "cited no authorities in support of his claim that more explanation was required in this summary report to satisfy the requirements of USPAP." The State similarly offers no authorities in support of the claim that Wold's explanation of his choice of comparables was inadequate under the terms of the USPAP.

Moreover, when Ferrara and the State attempted to specify what additional explanations the USPAP required Wold to provide under the circumstances, they often ignored the explanations that Wold did provide. For example, the State cites Ferrara's skepticism that a property one block away or half a mile

---

**14.** Nor is it logical to conclude, as both the State and Ferrara suggest, that the absence of lower-priced comparables provides evidence that the Copper Road property might not have had a value as low as Wold's appraisal claimed. Ferrara testified that "[i]t'd be very unusual that this is the lowest-priced property in that town." It is true that there can be only one lowest-priced property in any town, assuming all prop-

erties have different prices, and thus the lowest-priced property will by definition be unusual. But it is also true that every town will have a lowest-priced property, and a highest-priced one. Surely appraisers should not be exposed to a heightened risk of professional sanction under the USPAP simply because they happen to be appraising an atypical property.

away from the subject property could be $10,000 superior in location, and suggests that Wold should have provided some explanation for such adjustments. In fact, Wold's addendum does provide an explanation for these adjustments, stating that the subject property's location was inferior to the location of three of the comparables "due to the subject's access off a gravel spur road and lack of homogeneous surrounding properties." If this explanation was inadequate under the standards of the USPAP, the State does not indicate how; in fact, the State does not acknowledge the existence of the explanation at all, despite Wold having drawn attention to the explanation to it during his testimony.

The substantial evidence standard reflects the prudence of deferring to a state professional board's special competence in recognizing violations of professional standards. But we will not uphold the imposition of reputationally and economically damaging professional sanctions based on evidence that would not permit a reasonable mind to reach the conclusion in question.[15] To the extent that the Board faulted Wold for his choice of comparables, the Board's violation finding was based on nothing more than speculation that such comparables existed. To the extent that the Board accepted the possible absence of better comparables and faulted Wold for failing to explain his approach, the Board's violation finding lacked an adequate analytical basis in the USPAP and failed to adequately address the explanations that Wold did provide. We thus affirm the superior court's reversal of the Board's finding that Wold violated SR 1–1(b) in the Copper Road appraisal.

## B. The Board's Finding That Wold Violated SR 1–1(c) In The Copper Road Appraisal Update Was Not Supported By Substantial Evidence.

After Wold completed the summary appraisal report of the Copper Road property for Leif Entwit, Entwit hired the superintendent of a local contractor to inspect the property. The inspector, Garnet Dima, wrote in his one-page report that "[t]he house in question is showing signs of sagging in the floor which is equal to one inch to one inch ... and one eighth in six feet depending on the location."[16] Dima estimated that correcting the problem would require $25,000.

Based on Dima's report, Wold issued an update to the Copper Road appraisal on April 11, 1998. The update states that Wold reviewed Dima's letter and had a phone conversation with him. Wold revised his estimate of the value of the Copper Road property by deducting the $25,000 cost in Dima's estimate as well as $12,500 "to compensate for risk associated with effecting the cure, such as cost overruns and the potential that additional problems may be found that would increase the cost to cure." Wold's update includes various disclaimers, including that Wold relied on the expertise of Dima and his company. Wold's work file also indicates that he watched a video that confirmed Dima's inspection.

When the Entwit divorce case went to trial, the court critiqued Wold's appraisal and rejected the update, concluding that the Copper Road property had a value of $132,280 rather than Wold's estimate of $77,500.[17] The court stated that a civil engineer who testified at trial stopped short of endorsing the conclusion that there was serious settlement at the Copper Road residence.

The Board concluded:

Mr. Wold violated SR 1–1(c) when he blithely relied on a contractor's very short letter to further reduce the estimated value of the residence from $115,000 to $77,500. Given that the $115,000 valuation was derived using larger than normal ad-

15. See Wendte v. State, Bd. of Real Estate Appraisers, 70 P.3d 1089, 1091 (Alaska 2003).

16. That is, the sagging is equal to one to one and one-eighth inches over a six-foot span.

17. As Wold notes, it was the court's critical comments in the Entwit divorce case that prompted the Division to investigate Wold's Copper Road appraisal. Ferrara testified that he gave no weight to the court's comments in the Entwit case because "one attorney can be very good and convincing and can convince a judge to make some rulings ... that perhaps, [are] not balanced as [they] should be."

justments to comparable properties, a further reduction of 23% in estimated value requires more than a belief that the contractor's reputation in the community was good.

Standards Rule 1–1(c) in both the 1997 and 1998 editions of the USPAP states that an appraiser must "not render appraisal services in a careless or negligent manner, such as a series of errors that, considered individually, may not significantly affect the results of an appraisal, but which, when considered in the aggregate, would be misleading."

As support for the Board's conclusion that Wold violated USPAP SR 1–1(c), the State points in large part to Ferrara's testimony. Ferrara stated that "[i]t seems very unlikely that a home in this price range"—that is, at the low end of the market—"would be reduced in value to the extent shown in the update letter, particularly after the property was inspected by a Civil Engineer who does not share those same concerns as to settlement." As Ferrara clarified: "My thinking would be that if this were a $115,000 dollar house that it would be unlikely that someone would really consider repairing a sagging floor unless this became a significant structural problem, which it didn't indicate that it was." Ferrara's written review stated:

> It is up to the appraiser to understand the nature of the claims and to make an independent assessment of the issues and reflect the impact on the market value of the property. If the appraiser does not believe himself competent to make that decision, it is required by the Competency provisions of the Standards to obtain the necessary knowledge.

■ Again, Ferrara cites to no authority for the claim that Wold's investigation was inadequate under USPAP SR 1–1(c). The State presents no evidence in the record that undermines the extensively-supported claim by Wold's principal expert witness, Dr. John Kilpatrick, that "Ferrara's statement here appears nowhere in USPAP, in the peer-reviewed literature, or in appraisal literature." Nor does the State contest the accuracy of evidence cited by Wold to show the diligence with which he investigated Dima's report.

Instead, the State focuses on a brief portion of Ferrara's testimony to suggest that in addition to whatever investigation Wold performed, he also "should have looked at houses that were below $100,000 to see what kind of physical infirmities they had and make comparisons from that standpoint." But Ferrara provided no support in his testimony for the notion that the USPAP requires such an investigation. Ferrara's conclusions also appear to rest at least in part on factual speculation, such as his unsupported statement that according to his thinking "it would be unlikely" for someone to repair the sagging floor. Wold testified that he believed the foundation would have to be repaired before the property could qualify for financing. Ferrara's speculation to the contrary does not provide substantial evidence that Wold's belief was incorrect, much less that Wold violated the USPAP by operating on the basis of his belief.

Viewed as a whole, the record fails to provide an analytical basis upon which a reasonable mind could conclude that Wold violated USPAP SR 1–1(c) by relying on Dima's report as he did in the Copper Road appraisal update. We thus affirm the superior court's reversal of the Board's finding on this count.

### C. The Board's Finding That Wold Violated SR 1–1(a) In The Marina Appraisal Was Not Supported By Substantial Evidence.

In April 1998, Wold completed his appraisal of a marina facility in Ketchikan. Like the Copper Road appraisal, the marina appraisal was intended for use in the Entwit divorce. The marina was originally constructed in the 1960s and was in poor condition by the time of Wold's report.

Wold's appraisal considered both the cost approach and the income capitalization approach to valuing the property, but gave primary weight to the cost approach. "In the cost approach, the value of a property is derived by adding the estimated value of the site to the current cost of constructing a reproduction or replacement for the improve-

ments and then subtracting the amount of depreciation ... in the structures...."[18]

The Board concluded, based on a review of the evidence related to the marina property:

Mr. Wold violated SR 1–1(a) when he did not use recognized methods and techniques to produce a credible appraisal of the marina.... The explanation of why Mr. Wold used the cost approach is inadequate. Because cost and market value are usually more closely related when properties are new, the cost approach is valuable when estimating the value of new or relatively new construction.[19] The Entwit marina is definitely not new or relatively new construction. To apply the cost approach to older properties, it is mandatory that adequate data be available to measure depreciation, and that the data be fully explained.

Standards Rule 1–1(a) in both the 1997 and 1998 versions of the USPAP states that an appraiser must "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal."

█ The State argues that Wold violated the USPAP by relying on the cost approach to appraise the marina. But the mere use of the cost approach was not a violation of the USPAP.[20] Indeed, even Ferrara, the State's expert witness, acknowledged that it was not a violation of the USPAP for Wold to use the cost approach on the marina. Because the State offers no alternate authority for the conclusion that Wold's use of the cost approach was in itself a violation of the US-PAP, we focus on the State's argument that

Wold violated SR 1–1(a) "by not explaining why he used the cost approach."

The State's argument that Wold's explanation was inadequate is in large part a response to Kilpatrick's suggestion that Wold's use of the cost approach was appropriate because the marina was a "special purpose" property. However such properties are defined, it is uncontested that the cost approach can be an appropriate approach to appraising them.[21] The State argues, however, that Wold should have explicitly identified the marina as a "special purpose" property if this was Wold's basis for applying the cost approach. But the State cites no authority for the claim that wherever the cost approach is used based on a property being special purpose, the property must be explicitly identified as such, even in a summary report such as the marina appraisal, in order to comply with USPAP SR 1–1(a). The State's only support for this claim is Ferrara's testimony that "[y]ou would expect it to be mentioned" that a property was a special use property, particularly if a valuation approach was being used on that basis.[22]

The State thus urges us to infer, from Ferrara's statement that "[y]ou would expect" the special purpose nature of the marina to be identified in the present context, the conclusion that Wold's failure to explicitly identify the marina as "special purpose property" violated the USPAP. But one expert's statement of what he considers to be ordinary practice, without additional support, does not provide an adequate analytical basis for identifying the lower bound of acceptable professional conduct as defined by the US-PAP.

18. APPRAISAL INSTITUTE, *supra* note 10, at 142 (defining cost approach).

19. The Board relies on APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 354 (12th ed. 2001) to support this proposition.

20. As the State recognizes, "[t]he cost approach can be used to estimate the market value of special purpose properties." *See* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 338 (11th ed. 1996). The State offers no argument against Kilpatrick's conclusion that the marina was in fact a special purpose property. Instead, the State attempts to undermine this conclusion by

pointing to Wold's failure to identify the property as a special purpose property in the appraisal. As discussed below, the State cites no authority for the notion that the USPAP required Wold to identify the marina explicitly as a "special purpose property" in his report.

21. *See supra* note 20.

22. Moreover, Wold's appraisal did in fact state that the cost approach is particularly applicable to property with older improvements "when the improvements are relatively specialized and are located in an area where there are limited comparable properties on the market."

Because no reasonable mind could infer that Wold violated the USPAP solely on the basis of Ferrara's individual expectations, the Board lacked substantial evidence to find that Wold's explanation of his use of the cost approach violated SR 1–1(a) of the USPAP. We affirm the superior court's reversal of the Board's finding.

### D. The Board's Finding That Wold Violated SR 1–1(b) In The Marina Appraisal Was Not Supported By Substantial Evidence.

In part of the marina appraisal, Wold made deductions to the estimated value of the property based on depreciation inherent to the improvements on the property, such as the pier, ramp, and floats. Wold made deductions both for physical deterioration and "functional obsolescence."

*The Appraisal of Real Estate* presents functional obsolescence as one of three component parts of depreciation, along with physical deterioration and external obsolescence.[23] The latest edition defines functional obsolescence as follows:

> Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal. A building that was functionally adequate at the time of construction can become inadequate or less appealing as design standards, mechanical systems, and construction materials change over time.[24]

Wold's marina appraisal notes that depreciation inherent to the improvements on the property "includes physical deterioration and functional obsolescence." After describing the physical deterioration and concluding that the depreciated value of the improvements (approximately $50,000) is less than the previously estimated land value of $127,000, the appraisal states:

Typically, improvement values exceed land value. Where improvement values are substantially less than the land value, such improvements are deemed to represent [an] under improvement of the property and may be indicative of functional obsolescence. The high land value effectively shortens the remaining economic life of the improvements. Because · of the imbalance of land and improvement values, a functional obsolescence deduction of 50 percent is applied to the physically depreciated value of the improvements.

The Board summarized the portion of Wold's marina appraisal dealing with depreciation as follows: "Mr. Wold deducted $91,253 for the poor condition of the marina in his cost approach, and then proceeded to deduct an additional $24,569 for 'functional obsolescence'; this is a double deduction for the same characteristic." The Board concluded: "Mr. Wold's double deduction for depreciation and functional obsolescence violates SR 1–1(b) because it is a substantial error which affects the appraisal." Standards Rule 1–1(b) in both the 1997 and 1998 editions of the USPAP states that an appraiser must "not commit a substantial error of omission or commission that significantly affects an appraisal."

The State suggests that Dinneen's testimony in the Entwit divorce case supports the Board's conclusion. Dinneen testified that the marina "[is] just old and it hasn't been well-maintained in some spots," but that "I don't think that's a functional problem." Functional obsolescence, Dinneen testified, is "like a five-story office building without an elevator." Dinneen's written review of the marina appraisal made no mention of Wold's functional obsolescence analysis, nor did she state in her testimony in the record that Wold performed a double deduction.

Ferrara did not write in his review or testify that Wold performed a double deduction either, though his review does criticize Wold for identifying the obsolescence as

---

**23.** Appraisal Institute, *supra* note 10, at 424–25.

**24.** *Id.* at 434. The State inaccurately cites an earlier edition of the book as stating that "[a] five part test is required to determine functional obsolescence." In fact, the earlier edition states:

"Figure 17.3 diagrams a procedure that *can* be used to calculate all forms of functional obsolescence. . . ." Appraisal Institute, *supra* note 20, at 387 (emphasis added).

"functional" rather than "external and economic." Additionally, Ferrara criticized Wold's depreciation analysis as incomplete and unconvincing. As Wold's appeal suggests, the notion that Wold performed a double deduction seems to derive from the statement of opinion—not a finding—by the judge in the Entwit divorce case. The court criticized Wold's explanation of functional obsolescence in the appraisal as "tautological": "[Wold] deducts functional obsolescence to determine the value of the improvements and then concludes from the disparity between the value of the land and the value of the improvements that there must be functional obsolescence."

 The record does not support this interpretation of Wold's reasoning. Wold began by deducting from the improvements for physical deterioration, *not* for functional obsolescence. Wold then compared the land value to the value of the improvements, with the deduction for physical deterioration factored in, and noted that the land value was substantially greater than the post-deduction value of the improvements. Wold took this as an indication of functional obsolescence, and thus made a further deduction on that basis.

Whether or not Wold's inferences were appropriate, his reasoning does not represent a double deduction for the same characteristic. The earlier judge and Dinneen may be correct in suggesting that Wold's appraisal offers no description of the marina's functional obsolescence that fits a standard definition of that term. (To use Dinneen's phrase, Wold offers no description in the appraisal of a feature of the marina that is "like a five-story office building without an elevator.") But the Board did not find that Wold violated the USPAP through mislabeling a deduction for economic or external obsolescence as a deduction for functional obsolescence.[25] The Board's finding of a violation was based on Wold having made a double deduction for the same characteristic. This finding was not supported by substantial evidence.

We thus affirm the superior court's reversal of the Board's finding that Wold violated USPAP SR 1–1(b) by making a double deduction in the marina appraisal.

### E. The Board's Finding That Wold Violated SR 1–1(a)–(c) In The Ellis Island Appraisal Was Not Supported By Substantial Evidence.

In July 2002, Wold completed an appraisal of the Ellis Island property in Ketchikan. The property consists of a luxury single family residence, guest house, pump house, boat house, marine float, ramp, and piling. The improvements and amenities are deluxe, including copper roofing on the main house and guest house. Using the cost approach, Wold estimated the value of the buildings and improvements at roughly $2,100,000. The appraisal states that the sales comparison approach was not used because "[n]o sales of luxury residences located on islands were found in the Ketchikan marketplace."

The Ellis Island appraisal was commissioned to play a role in litigation between neighbors that partly dealt with access rights. The defendants in the litigation hired appraiser Vince Coan, a member of the Board, to review Wold's appraisal. Coan forwarded his review to the Board because he concluded that Wold violated SR 1–1 by not including a sales comparison approach and SR 2–2(a)(xi) by preparing a "limited scope appraisal in a self-contained format" but labeling it as a "a complete appraisal submitted in a self-contained report format." We discuss the SR 2–2(a)(xi) violation below in Part IV.F.

The Board concluded, based on a review of the evidence related to the Ellis Island property:

Mr. Wold did violate SR 1–1(a). Use of the cost approach, only, to value residential property under the facts of this case is not reasonable. There is no dispute among the experts and in the literature that correct use of the sales comparison approach will produce the most accurate results. Use of the sales comparison approach re-

---

**25.** "External" or "economic" obsolescence refers to a mismatch between a piece of property and the existing market, rather than an inherent mismatch between a piece of property and its intended purpose. *See* The Appraisal of Real Estate, *supra* note 10, at 442–44.

quires locating comparable property sales. Mr. Wold apparently limited his search to high-end island properties in the Ketchikan area. This is unreasonable given that higher priced, non island properties in the Ketchikan area and in nearby Southeast Alaska communities could be used. Failure to exhaust the search for comparable properties does not meet the USPAP requirement that the appraiser must produce a credible appraisal by correctly using the best recognized method; if the best recognized method (sale comparison approach) is not used, strong justification must be given. Absent a much greater demonstration of due diligence, use of the cost approach method is inadequate to produce a credible appraisal.

The Board also concluded that Wold violated SR 1–1(b) by failing "to exercise due diligence and gather sufficient relevant and material information," which would have included "the sale of all high-end residential properties in Southeast Alaska." Finally, the Board concluded that Wold violated SR 1–1(c) by failing to "reasonably exhaust his search for the sale of comparable properties," which "translates to negligence in the conduct of this residential appraisal."

Standards Rule 1–1(a) in the 2002 edition of the USPAP continued to state that an appraiser must "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal." Standards Rule 1–1(b) also remained the same, stating that an appraiser must "not commit a substantial error of omission or commission that significantly affects an appraisal." Standards Rule 1–1(c) was altered slightly in the 2002 edition of the USPAP. It states that an appraiser must "not render appraisal services in a careless or negligent manner, such as by making a series of errors that ... individually might not significantly affect the results of an appraisal, [but] in the aggregate affect the credibility of those results."[26]

▮ In sum, the Board's decision suggests that Wold's inadequate search, and his consequent reliance on the cost approach,

represented a failure to employ the recognized methods necessary to produce a credible appraisal (in violation of SR 1–1(a)), a substantial error that significantly affected the appraisal (in violation of SR 1–1(b)), and negligence (in violation of SR 1–1(c)). We address the alleged SR 1–1 violations regarding the Ellis Island appraisal together because each depends on the Board's conclusion that Wold did not perform an adequate search for comparable properties.

We assume that the Board based its conclusion that Wold "apparently limited his search to high-end island properties in the Ketchikan area" on Coan's written review and his testimony, as well as Ferrara's review, his supplement to that review, and his testimony. Coan's written review criticizes Wold's decision to exclude the sales comparison approach based on the lack of "sales of luxury residences located on islands ... in the Ketchikan marketplace."

It would be typical for appraisers to include developed high-end residential properties from Ketchikan and other areas in Southeast Alaska when estimating market value. As part of the review process, we queried other Southeast appraisers as to the availability of market data for similar properties in the Southeast area, and it was reported to us that market information is available. I am personally aware of the Spring, 2001 purchase of an island residence in the Sitka area, which was subsequently remodeled.

Coan testified that "one sentence saying we did not have sales of luxury residences on an island in Ketchikan is not adequate, in my opinion, to not consider a sales comparison approach." "I would have liked to have seen some comparables," Coan noted, before adding that he did not analyze the comparables that were sent to him as part of his desk review.

Ferrara testified that "looking for luxury residences on islands as the only basis for comparable data, I think was an incorrect process, and ... leaving out sales of other luxury residences on waterfront properties

---

**26.** Neither the State nor Wold contests the Board's use of the 2002 version of the USPAP in evaluating the Ellis Island appraisal, which was completed in July 2002.

... was an omission in the appraisal." Ferrara also testified: · "In the past 25 years of appraising for all different banks, federal government, FHA, PA and all kinds of places, I've never seen a residential appraisal that solely used a cost approach. Ever."

But Wold testified that he did, in fact, conduct a search for comparables beyond "sales of luxury residences located on islands ... in the Ketchikan marketplace." He testified that he examined his office's comparable sales database and obtained information from others, including an appraiser in Sitka and an assessor in Juneau. Both the appraiser and the assessor told Wold that they knew of no sales comparable to the Ellis Island property.[27]

Wold also persuasively argues that Coan's testimony fatally undermined Coan's original, written claim to have confirmed the existence of market data for properties in Southeast Alaska similar to the Ellis Island property. One of Coan's sources was the same appraiser in Sitka that Wold contacted. But whereas Wold provided details about the nature of the Ellis Island property before asking whether there were comparables, Coan agreed in his testimony that he "simply asked [the appraiser] if he had comps for luxury homes in Sitka," or perhaps in Southeast Alaska generally. Coan also contacted another residential appraiser. Coan agreed in testimony that when he wrote his review, "the only information [he] had" was from the two appraisers "that there were luxury or high-end homes in both Sitka and Ketchikan."

As for Coan's claim in the review that he was "personally aware of the Spring, 2001

purchase of an island residence in the Sitka area," he testified that he learned of the sale at a cocktail party and discovered after submitting his review that the sale was for $610,000. Wold testified that he investigated whether this property was comparable, included documentation in his files, and concluded—along with the appraiser in Sitka—that it was not. As Judge Stephens rightly noted, if Wold had included the $610,000 property as a comparable, it would have required even greater adjustments than the ones Ferrara criticized as a violation of the USPAP in the Copper Road appraisal.

The evidence regarding the Ellis Island appraisal bears a strong structural resemblance to the evidence above that Wold did not perform an adequate search for comparables to the Copper Road property. Just as Wold's appraisal of the Copper Road property presented it as an outlier on the low end of the real estate market in Ketchikan, so Wold's appraisal of the Ellis Island property presented it as an outlier on the high end of the Ketchikan market. And just as Ferrara expressed strong skepticism toward the idea that there were no better comparables for the Copper Road property than the ones used by Wold, so Coan and Ferrara expressed strong skepticism toward the idea that there were no comparables for the Ellis Island property that would have been sufficient to allow Wold to use the sales comparison approach. But like Ferrara in his criticism of the Copper Road appraisal, Coan and Ferrara in their criticisms of the Ellis Island appraisal fail to provide any evidence sufficient to support their intuitions.[28]

**27.** In its reply brief, the State implies that the Board simply rejected Wold's testimony regarding his efforts to find comparables, instead relying on the disclaimer statement in the appraisal to conclude that Wold's search was limited to luxury island properties in the Ketchikan market. To the extent that this is an accurate characterization of the Board's reasoning, the Board's finding is not based on substantial evidence in light of the whole record. Wold testified in great detail regarding the steps he took to research properties outside Ketchikan, and the State offers no basis for concluding that Wold's testimony was inaccurate. Indeed, during cross-examination of Wold, the State asked him about an investigation of a comparable in Sitka that he performed. Since Sitka is not in the Ketchikan

marketplace, the State's own question indicates acceptance of the fact that Wold performed research outside the limits suggested by the disclaimer in the appraisal. No reasonable mind could conclude on the basis of the record that Wold limited his search to luxury island residences in Ketchikan.

**28.** The State defends this lack of evidence by arguing that "it was not the Board's job to complete Wold's appraisal," and cites to a discussion of the professional standards for desk reviews. But this professional standard does not address whether the State is required to produce more evidence in order to satisfy the evidentiary standard governing the Board's decisions. It may be

Because no reasonable mind could conclude in light of the whole record that the State established by a preponderance of the evidence that Wold failed to perform an adequate search of comparables for the Ellis Island property, the Board's finding that Wold violated USPAP SR 1–1(a)–(c) in the Ellis Island appraisal was not supported by substantial evidence. We thus affirm the superior court's reversal of the Board's findings on these counts.

### F. The Board's Finding That Wold Violated SR 2–2(a)(xi) In The Ellis Island Appraisal Was Not Supported By Substantial Evidence.

The superior court affirmed only one of the Board's violation findings: the finding that Wold violated SR 2–2(a)(xi) by failing to adequately explain his rejection of the sales comparison approach in the Ellis Island appraisal. Wold's explanation consisted of the following statement: "No sales of luxury residences located on islands were found in the Ketchikan marketplace. Therefore, the sales comparison approach to value was not used."

The Board's decision states:

Mr. Wold violated SR 2–2(a)(xi) because he failed to explain adequately his departures from the requirements of SR 1, e.g., if the appraiser rejects the sales comparison approach in a residential appraisal, the departure must be adequately explained.

SR 2–2 in the 2002 edition of the USPAP states:

Each written real property appraisal report must be prepared under one of the following three options and prominently state which option is used: Self–Contained Appraisal Report, Summary Appraisal Report, or Restricted Use Appraisal Report.

(a) The content of a Self–Contained Appraisal Report must be consistent with the intended use of the appraisal and, at a minimum:

. . .

(xi) state and explain any permitted departures from specific requirements of STANDARD 1 and the reason for excluding any of the usual valuation approaches. . . .

Wold's cross-appeal argues that his one-sentence explanation for not using the sales comparison approach was sufficient for the requirements of SR 2–2(a)(xi).

■ As Wold suggests, the Board's decision on this count appears to have been based on the following reasoning: (1) comparable sales data existed that could have allowed Wold to use the sales comparison approach; (2) the sales comparison approach was therefore applicable to the Ellis Island appraisal; (3) by not employing the sales comparison approach, Wold was making a "departure" from the requirements of SR 1; (4) under SR 2–2(a)(xi), Wold was thus required to "state and explain" this departure.

But we concluded in the previous section that the record lacked substantial evidence of comparable sales data, which could have allowed Wold to use the sales comparison approach. If adequate comparables did not exist, then the sales comparison approach was inapplicable to the Ellis Island property and Wold's failure to use the sales comparison approach was not a departure from the requirements of SR 1. Wold cannot have violated SR 2–2(a)(xi) by failing to explain his departure from SR 1 if, as we concluded, no departure took place.

As Wold's cross-appeal suggests, this "leaves only the question of whether Wold adequately stated and explained why he was not using the sales comparison approach." The State's own primary expert witness, Ferrara, testified that Wold's explanation for his decision not to use the sales comparison approach "was not a violation." Wold's primary expert witness, Kilpatrick, reached the same conclusion. Even Coan indirectly suggested in his testimony that if there were no comparable properties, the sales comparison approach would have been inapplicable, and Wold's decision not to use it would not re-

the case that desk reviewers are under no professional obligation to search out comparables before accusing someone of a USPAP violation; but this does not imply that such a desk review is adequate under the present circumstances to prove by a preponderance of the evidence that a USPAP violation took place.

quire any more explanation than the brief explanation Wold provided.

Based on our review of the record as a whole, including the above testimony, we do not find substantial evidence in support of the conclusion that Wold violated USPAP 2–2(a)(xi) by not providing a more detailed explanation of why he did not employ the sales comparison approach in the Ellis Island appraisal. We thus reverse the superior court's affirmation of the Board's decision on this count.

## G. Other Issues

### 1. Negligence under AS 08.87.200(1)

The State includes a brief defense of the Board's finding that Wold violated AS 08.87.200(1), which prohibits negligence by appraisers.[29] We agree with Judge Stephens's conclusion that because the negligence finding receives no explanation in the Board's decision apart from the explanation of Wold's USPAP violations, it must depend entirely on them. Because we have reversed all of the Board's violation findings, we reverse the Board's finding that Wold violated AS 08.87.200(1) as well.

### 2. Excessive sanctions

Because we have reversed all of the Board's violation findings, the State's argument on appeal that the Board's original sanctions against Wold were not excessive is moot, and we decline to reach it.

### 3. Attorney's fees

Because we have reversed the superior court's finding that Wold violated SR 2–2(a)(xi), we remand to the superior court for a new calculation of attorney's fees.[30]

## V. CONCLUSION

For the foregoing reasons, we AFFIRM the superior court on all points except the superior court's upholding of the Board's

finding that Wold violated SR 2–2(a)(xi) in the Ellis Island appraisal. On that point, we REVERSE the superior court. We REMAND to the superior court for a new consideration of attorney's fees in light of this decision.

WINFREE and CHRISTEN, Justices, not participating.

---

**29.** AS 08.87.200 states:
A certified real estate appraiser may not (1) act negligently or incompetently or fail without good cause to exercise reasonable diligence in developing an appraisal, preparing an appraisal report, or communicating an appraisal. . . .

**30.** In light of our remand, we decline to reach the issue of whether Judge Stephens abused his discretion by awarding Wold 50% of the reasonable attorney's fees he necessarily incurred.