*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALASKA POLICE STANDARDS COUNCIL, | ) ) ) | Supreme Court No. S-17079 |
| Appellant, | ) ) | Superior Court No. 1KE-17-00069 CI |
| v. | ) ) | O P I N I O N |
| VALENT MAXWELL, | ) ) | No. 7458 – June 12, 2020 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Trevor Stephens, Judge.

Appearances: Lisa Kelley, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellant. Michael P. Heiser, Ketchikan, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

MAASSEN, Justice.
STOWERS, Justice, dissenting.

## I.    INTRODUCTION

A police officer applied for a Permanent Fund Dividend (PFD) for several years when he was not eligible to receive one. Following an investigation, the Executive Director of the Alaska Police Standards Council petitioned the Council to revoke the

officer's police certificate on the ground that he lacked good moral character. An administrative law judge recommended against revoking the certificate, finding that the officer's mistakes were not sufficient to demonstrate dishonesty or a lack of respect for the law. The Council, however, concluded that the officer's hearing testimony — that he would fill out the applications in the same way if he had to do it over again — showed dishonesty and a lack of respect for the law, and it therefore revoked his certificate.

The superior court agreed with the administrative law judge's analysis of the evidence and the law and reversed the Council's decision. The Council appeals.

We conclude that the evidence disproportionately supports the finding of the administrative law judge that the police officer's PFD applications and hearing testimony, while mistaken about the law, were not sufficient to raise substantial doubts about the officer's good moral character. We therefore affirm the superior court's decision reversing the Council's revocation of the police certificate.

## II.    FACTS AND PROCEEDINGS

### A.    Background Facts

In May 2012 Valent Maxwell, a police officer for the City of Klawock, accepted a law enforcement job in Fairview, Montana. He left some belongings in his city-owned apartment in Klawock, sold some, and moved or shipped the rest to Montana. Shortly after starting the new job, however, he quit, finding his salary inadequate to meet the cost of living. He returned to his job in Klawock, having been gone from Alaska for 24 days.

In October 2013 Maxwell accepted another job in Montana, this time as police chief in Ronan. He moved to Montana, where he permanently registered his vehicle. But he was fired from this job in early January 2014, and again he returned to

his job in Klawock. He had been gone from Alaska for 70 days in 2013 and 59 days in 2014.

Maxwell applied for and received the Alaska Permanent Fund dividend for both 2013 and 2014, certifying by his electronic signature that he had been a resident for the full preceding year and had not claimed residency in any other state. The application forms do not define residency.[1] Governing regulations, however, list circumstances that will make a person ineligible for a dividend, including (with some exceptions not relevant here): (1) maintaining "the individual's principal home in another state or country";[2] (2) "accept[ing] full-time, permanent employment in another state or country";[3] and (3) "obtain[ing] any other benefit or benefits as a result of establishing or maintaining any claim of residency in another state or country or by disclaiming Alaska residency."[4]

In 2015 an Alaska Wildlife Trooper informed an investigator with the PFD Investigations Unit that Maxwell had lived in Montana for portions of 2013 and 2014. The investigator confirmed the relevant details. In an interview with the trooper, Maxwell admitted that he moved to Montana in 2012 and 2013 to accept full-time employment, got a Montana driver's license, and registered his vehicle there. He explained, however, that he was gone for only a few months in all, that he "didn't intend to make Montana [his] home," that "[i]t was a stepping stone to somewhere else," and

---

[1]    *See* Department of Revenue, Permanent Fund Division, Alaska Permanent Fund Dividend 2013 and 2014 Adult Applications (2013 & 2014) (on file with the Alaska Department of Revenue).

[2]    15 Alaska Administrative Code (AAC) 23.143(d)(1) (2019).

[3]    15 AAC 23.143(d)(4).

[4]    15 AAC 23.143(d)(17).

that Alaska — where he had left most of his belongings — "was always an option to come back to." He thought he had disclosed on the PFD application forms the dates he was gone from Alaska (but in fact the forms did not request that information); he conceded that he may have misunderstood the forms' questions but insisted that he never intended to "cover up that [he] was gone, that [was not him]."

## B. Proceedings

The State charged Maxwell criminally with theft and unsworn falsification for his receipt of the 2013 and 2014 PFDs. He was acquitted after a bench trial before Superior Court Judge Luis J. Menendez, who found that the State had not proven the *mens rea* element of the crimes. In rendering his verdict, Judge Menendez discussed the evidence related to residency: Maxwell's successive jobs in Montana, his returns to Klawock, and the fact that during both moves he left most of his possessions in Klawock. The judge did not, however, rule on whether Maxwell had remained an Alaska resident or was eligible to claim the PFD. The judge noted repeatedly that the acquittal was based on the State's inability to prove the element of intent essential to the criminal charges.

In January 2016, while the criminal case was pending, the Executive Director of the Alaska Police Standards Council filed an accusation alleging that Maxwell's conduct — in claiming PFDs despite full-time employment outside Alaska — demonstrated a lack of good moral character that justified revocation of his police certificate.[5] A three-day telephonic hearing was held in June 2016 before an administrative law judge (ALJ).

---

[5] A Council regulation, 13 AAC 85.900(7) (2019), defines "good moral character" as "the absence of acts or conduct that would cause a reasonable person to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States."

## C. The ALJ's Decision

The ALJ's written decision concluded that the Executive Director had failed to prove that Maxwell lacked sufficient moral character to hold a police certificate. The ALJ began by stating his "clear, firm, and definite conclusion" that "Maxwell was not eligible for the 2013 or 2014 PFDs." The ALJ based this conclusion on the regulatory definition of residency and undisputed evidence that Maxwell had "[m]aintained a primary home in another state,"[6] "[a]ccepted full-time permanent employment in another state,"[7] and "[o]btained a benefit of residency from another state."[8]

The ALJ next considered the objective reasonableness of Maxwell's actions: whether "a reasonable person in Officer Maxwell's position [could] have had a good-faith belief that he was eligible when he applied for his 2013 and 2014 PFDs." The ALJ noted that "[h]onest people . . . can make honest mistakes." He observed that "[m]any Alaskans leave the state for extended periods of time" without necessarily losing their residency or PFD eligibility, and that "[m]ost Alaskans likely know that a 90-day absence is a critical decision point" because the application form asks about absences of that length. He noted that unless an applicant reviewed the PFD regulations, he might not realize he could lose his residency and PFD eligibility by taking "a job in probationary status, with a high risk of failure, and for which the person kept alive the safety valve of returning to his . . . old job in Alaska." The ALJ also found it significant that "[t]he Department of Revenue encourages people who [do] not know whether they

---

[6]    *See* 15 AAC 23.143(d)(1).

[7]    *See* 15 AAC 23.143(d)(4).

[8]    *See* 15 AAC 23.143(d)(17). The ALJ found that Maxwell's "permanent registration" of his motor vehicle in Montana was a less expensive alternative to nonresident registration and thus a benefit of Montana residency.

are eligible to apply, so that the [D]epartment can determine [their] eligibility." In the ALJ's view, this demonstrated that "the Department of Revenue does not consider it dishonest for a person who is unsure to apply and certify that the person was a resident."

The ALJ discussed the differences between residency and PFD eligibility; for example, because residency depends in part on an intent to return to Alaska, a person who takes a job for a defined period outside Alaska, intending to return to the state, could remain an Alaska resident even though ineligible for the PFD because of the extended absence.[9] "Therefore, signing a PFD application, and certifying *residency* for the entire qualifying year[,] would not necessarily be dishonest unless a person understood the rules for when residency is lost." (Emphasis in original.) The ALJ also observed that the PFD application form does not ask questions that would help an applicant recognize a lack of eligibility, such as questions about out-of-state employment and primary home. In fact, the PFD investigator testified at the hearing that "the Department of Revenue instructs people in Officer Maxwell's situation to answer 'yes' to the question about being absent for more than 90 days, even though, in Officer Maxwell's case, this was not true"; a "yes" answer would prompt the Department to inquire about the applicant's circumstances and uncover the reasons for ineligibility. However, as the ALJ noted, nobody advised Maxwell that he should do this, and the ALJ declined to "hold Officer Maxwell to account for not saying he was out of state for more than 90 days when he was not."

The ALJ summarized his objective reasonableness findings: "Given that [Maxwell's] tenure at his Montanan jobs was short, that he remained in contact with his

---

[9] The ALJ cited a previous administrative decision concluding that "accepting permanent full-time employment with the intent to quit and return to Alaska may be sufficient to retain Alaska residency." *In re K.R.F.*, OAH No. 09-0249-PFD at 4 ( Oct. 16, 2009).

former employer, and that the PFD application did not trigger any obvious indication of ineligibility, an honest person in his situation could apply in good faith." Therefore, despite "significant red flags," the ALJ declined to "presume that [Maxwell's] act of applying was dishonest."

Having concluded that a reasonable person could have acted as Maxwell did, the ALJ turned to "evidence of Officer Maxwell's actual state of mind." The ALJ addressed three categories of evidence the Executive Director relied on to show Maxwell's subjective dishonesty: (1) opinion testimony from witnesses who considered him to be untruthful; (2) questionable statements in the 2015 interview with the trooper; and (3) Maxwell's testimony at the hearing that he still believed he was eligible for the 2013 and 2014 PFDs.

The ALJ found that "this line of argument was not persuasive." He found that the questionable statements in the 2015 interview were more in the nature of "minor misstatements or misremembered things in [the] sudden and stressful informal interview" and "would not be a reason to doubt [Maxwell's] credibility when he [was] testifying under oath."[10] The ALJ found that Maxwell was "not a sharp operator"[11] but rather "present[ed] as an uncertain and stressed individual who was trying to give truthful answers."

---

[10]    The statements questioned by the Executive Director were (1) that Maxwell's first move to Montana "ended up being more of a vacation"; (2) that he was "not familiar with how the PFD works"; and (3) that he "crash[ed] through those PFD applications at the last minute." (Alteration in original.)

[11]    We assume the ALJ used the term "sharp operator" to mean someone who intentionally takes advantage of another's misplaced trust. *See, e.g.*, *Del Mar v. Caspe*, 272 Cal. Rptr. 446, 451 n.4 (Cal. App. 1990) ("Usury laws are designed to protect the public from sharp operators who would take advantage of 'unwary and necessitous borrowers.' "); *sharp*, WEBSTER'S II NEW COLLEGE DICTIONARY (2001) ("Artful: devious <*sharp* selling practices>").

The ALJ found most troubling the third category of evidence of Maxwell's state of mind — his hearing testimony that he still believed he was eligible for the 2013 and 2014 PFDs. Maxwell had the following exchange with his attorney:

> Q. When at the end of the application for the 2014 PFD where it states [that] "I certify that I was an Alaska resident for all of 2013," what did you believe in regard to whether or not you believed the statement to be true?
>
> A. I believe that statement was true then and I believe it's true now.

The Executive Director's attorney later asked Maxwell whether he "would do exactly the same thing" if he were signing the 2013 and 2014 applications. He responded:

> A. Yes. I didn't do anything wrong. I was completely honest and forthcoming on those applications. I did not intentionally set out to . . . mislead or deceive anybody and I believe that that was all held to be true in my criminal case. So, again, yes, given what I know today, I would not change a thing as far as those applications are concerned.
>
> Q. So, in your mind, the fact that a judge found you not guilty of committing a certain specific crime, that means you didn't do anything wrong in connection with [the] PFD application process? . . . [I]s that your understanding?
>
> A. No, sir. No, that's not exactly correct.
>
> . . .
>
> A. . . . [D]uring his verdict [the judge] stated that in his opinion, my Alaska residency was not severed. And in his opinion, there was no intent to defraud or mislead the State of Alaska. And in his opinion the PFD applications were true and correct.
>
> So, given the fact that . . . Judge Menendez [was] giving those opinions after, I guess, two days of . . . debating the issue of residency, based upon my knowledge of his opinion, no, I don't believe that I broke my residency. . . . I

did not intend to mislead or defraud anybody. So, with the basis of your question, yes, absolutely, I would do the same thing all over again . . . given what I know now.

The ALJ was troubled by Maxwell's testimony, noting that — especially given his police training — he should have realized that an acquittal of criminal charges was not an endorsement of his underlying conduct. According to the ALJ, Maxwell also should have acknowledged the expert testimony that "he was no longer an Alaska resident," and he should accordingly have been more hesitant to say he would "do the same thing again and just accept a benefit to which he [was] not entitled."

The ALJ also clarified that, contrary to Maxwell's recollection, Judge Menendez did *not* make rulings on residency or eligibility; the judge ruled only on intent. The ALJ observed, however, that Judge Menendez did make "comments that could be interpreted to go to the issues of residency and eligibility" when describing some of the evidence related to those issues. The ALJ noted that "Maxwell heard the comments only once, in the courtroom, at the time he was being acquitted of a criminal charge," and under the circumstances his failure to fully comprehend their meaning was understandable. The ALJ was also unwilling to give much weight to speculative answers to hypothetical questions. Ultimately, though troubled by Maxwell's hearing testimony, the ALJ concluded that it did not rise to the threshold of creating "*substantial* doubt" about his respect for the law. (Emphasis in original.)

As the final step in his analysis, the ALJ examined whether the totality of the evidence warranted "substantial doubt" about whether Maxwell was of good moral character. The ALJ analogized the case to another matter, *In re Lynch*,[12] in which "the Council declined to revoke a certificate when an officer signed an affidavit that contained a false statement, and then testified in his defense that he continued to believe his false

---

[12]    OAH No. 14-1644-POC (Apr. 20, 2015).

statement was true (when it was not)"; the ALJ concluded that Maxwell's conduct in applying for PFDs "was more remote from his police duties than was the affidavit at issue in *Lynch*." Looking for dishonesty in the PFD applications, and acknowledging "some doubt," the ALJ found "no evidence of intent or deception," which prevented the ALJ "from forming substantial doubt." The ALJ concluded, therefore, that the Executive Director had failed to prove that Maxwell lacked "sufficient moral character to retain his police certificate."

### D. The Council's Decision

In a December 2016 final decision, the Council accepted most of the ALJ's factual and legal analysis but rejected his ultimate conclusion because of Maxwell's hearing testimony. In the Council's view, Maxwell's "continued belief in an inaccurate interpretation of the law in his testimony that he would do the same thing again" demonstrated "trickery[,] because he knows now that the application does not disclose his absences"; this raised "substantial doubt . . . about his respect for the law." The Council did not credit Maxwell's professed belief that Judge Menendez approved his conduct, concluding that a "person with police training" should understand that the verdict in the criminal case was not a finding that he was in fact eligible for the PFDs. Relying on recent precedent for the conclusion that "a pattern of conduct is not required — one instance of dishonest . . . conduct may meet the threshold,"[13] the Council found that Maxwell's hearing testimony "demonstrate[d] a fundamental lack of understanding of the law, and more importantly, a lack of respect for the law." Having substantial doubts about Maxwell's moral character, the Council revoked his certificate.

---

[13] *See Alaska Police Standards Council v. Parcell*, 348 P.3d 882, 888 (Alaska 2015).

## E.    The Superior Court's Decision

Maxwell appealed the revocation of his certificate to the superior court, which in April 2018 reversed the Council's decision. The court analyzed the Council's findings on both "lack of honesty" and "lack of respect for the law" and determined they were unsupported by substantial evidence. On the question of honesty, the court found "at least seven reasons" to disagree with the Council's determination: (1) all information in Maxwell's PFD applications was accurate other than his certification of residency; (2) the Council did not make a finding that Maxwell was dishonest at the time he submitted the applications; (3) in the colloquy that led to Maxwell's troubling hearing testimony, he was not told to assume he was in fact ineligible for the PFDs;[14] (4) the Department's own suggested procedure for Maxwell to follow still required that he falsely certify his residency, as well as misstate the length of his absence as more than 90 days — an approach that is less strictly honest than what Maxwell did; (5) Maxwell's testimony that he would apply in the same way again indicated dishonesty only if one assumed that he understood he was not qualified to receive the PFDs, which was "not what . . . Maxwell intended to relate"; (6) the record reflected that Maxwell was "not 'a sharp operator' " and at the time of his testimony still did not seem to understand the law; and therefore, (7) viewing the record in its entirety, "the evidence detracting from the [Council's] decision [on dishonesty was] dramatically disproportionate to the evidence supporting the decision."

The superior court determined that the Council's findings on Maxwell's "lack of respect for the law" were likewise "not supported by substantial evidence." The court gave four reasons for this: (1) the Council's findings on this element were

---

[14]    The superior court pointed out that when Maxwell "was asked on redirect . . . whether he would have applied for the PFDs at issue if he believed his Alaska residency had been severed," his answer was no.

"interrelated to and intertwined with" its findings on honesty; (2) Maxwell was "substantially confused about Alaska residency law when he testified;" (3) the Council may have been "equating a lack of understanding of the law with lack of respect for the law," a position it did not support or explain; and therefore, again, (4) "the evidence detracting from [the Council's] decision . . . [was] dramatically disproportionate to the evidence supporting the decision."

Concluding that the Council's findings on Maxwell's lack of "good moral character" were not supported by substantial evidence of either dishonesty or lack of respect for the law, the superior court reversed the Council's decision to revoke the police certificate. The Council appeals to us.

## III.   STANDARD OF REVIEW

When the superior court is acting as an intermediate court of appeals, we do not defer to the superior court but rather "independently review the merits of [the] administrative determination."[15] We have "recognized at least four principal standards of review" for administrative proceedings, depending on the circumstances.[16] In this case, the substantial evidence test — used for questions of fact — applies.[17]

---

[15]   *Bruner v. Petersen*, 944 P.2d 43, 47 n.5 (Alaska 1997).

[16]   *Simpson v. State, Commercial Fisheries Entry Comm'n*, 101 P.3d 605, 609 (Alaska 2004) (citing *Jager v. State*, 537 P.2d 1100, 1107 n.23 (Alaska 1975)).

[17]   *Parcell*, 348 P.3d at 886 ("Questions of fact are reviewed for substantial evidence." (quoting *West v. Municipality of Anchorage*, 174 P.3d 224, 226 (Alaska 2007))); *see Much v. Alaska Police Standards Council*, No. S-16225, 2018 WL 1779323, at *6 (Alaska Apr. 11, 2018) (applying substantial evidence standard to factual findings the Council relied upon in ultimately determining officer "lacked good moral character").

We have defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[18] While this is a deferential standard, we will "review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence supporting the decision to be 'substantial.' "[19] The standard is intended to acknowledge a "professional board's special competence in recognizing violations of professional standards" while preventing "the imposition of reputationally and economically damaging professional sanctions based on evidence that would not permit a reasonable mind to reach the conclusion in question."[20]

## IV. DISCUSSION

### A. Legal Context: The Police Standards Council

The Council is a 13-member body composed of police professionals, administrators, and civilians.[21] Its mission is ensuring that police officers "meet minimum standards for employment."[22] To that end, the Council is empowered to set

---

[18] *Odom v. State, Div. of Corps.*, 421 P.3d 1, 6 (Alaska 2018) (quoting *Storrs v. State Med. Bd.*, 664 P.2d 547, 554 (Alaska 1983)).

[19] *Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 635 n.40 (Alaska 2011) (emphasis in original) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

[20] *Odom*, 421 P.3d at 6 (quoting *State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Corps., Bus. & Prof'l Licensing v. Wold*, 278 P.3d 266, 273 (Alaska 2012)).

[21] AS 18.65.150.

[22] AS 18.65.130; *see also* AS 18.65.220(2), (6) (authorizing Council to establish minimum standards and investigate officers believed to fall short of those standards).

professional requirements for police officers and "the means of presenting evidence of fulfillment of [those] requirements."[23] The Council issues certificates showing that officers have the necessary qualifications.[24]

The Council may also revoke certificates.[25] A certificate may be revoked if the holder "does not meet the standards" for officers specified in Council regulations.[26] One such standard is that an officer "is of good moral character."[27] "[G]ood moral character" is defined as

> the absence of acts or conduct that would cause a reasonable person to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States; for purposes of this standard, a determination of lack of "good moral character" may be based upon a consideration of all aspects of a person's character . . . .[28]

Council decisions suggest that the constituent elements of good moral character are to be considered collectively; they need not all be in doubt before someone is disqualified from serving as an officer.[29] In this case, the Council found that Maxwell lacked good

---

[23] AS 18.65.240(a).

[24] AS 18.65.240(b).

[25] AS 18.65.240(c).

[26] 13 AAC 85.110(a)(3) (2019); *see* 13 AAC 85.010(a)-(b). Both regulations have been amended several times, but the amendments do not affect our analysis here.

[27] 13 AAC 85.010(a)(3).

[28] 13 AAC 85.900(7).

[29] *See, e.g.*, *In re E.X.*, OAH No. 13-0473-POC at 16 (Dec. 23, 2013).

moral character because his conduct would cause a reasonable person to have substantial doubts about his honesty and his respect for the law.

**B.     The Council's Factual Determinations Were Not Supported By Substantial Evidence.**

The Council contends that its decision should be upheld as an exercise of its expertise and policy judgment in an area that falls "squarely within the Council's statutorily delegated authority."   As a reasonable basis for revoking Maxwell's certificate, the Council relies on his testimony that, given the same circumstances, he would apply for the PFDs again.   The Council contends that "[t]his statement in particular supports a reasonable mind's acceptance of the conclusion that Maxwell lacks respect for the law, and so raises substantial doubts about his good moral character." The Council dismisses Maxwell's reliance on what he thought were Judge Menendez's comments about his eligibility, noting that the judge told Maxwell expressly "that his acquittal was based only on the [S]tate's failure to prove its case beyond a reasonable doubt" and "that the [S]tate could proceed against him in a civil case."   The Council argues that given Maxwell's police training, he "could reasonably be expected to understand that his acquittal was not a determination that he was a resident of Alaska" or eligible for the PFDs.

Maxwell argues, on the other hand, that "the evidence detracting from the agency's decision is dramatically disproportionate to the evidence supporting it."[30]  We agree with his argument to this extent:   the evidence disproportionately supports a finding that Maxwell still did not understand the law at the time he gave his problematic hearing testimony.

---

[30]     *See Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 267 P.3d 624, 635 n.40 (Alaska 2011) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Although our review of the Council's decision is de novo, the superior court's reasoning on this point is persuasive. Most pertinent are the court's observations that (1) Maxwell's testimony that he would apply again in the same way indicates dishonesty only if one assumes that he understood he was ineligible; but (2) when he gave the testimony at issue he had not been told to assume he was ineligible; and (3) the record reflects that he still believed he was eligible. As the superior court noted, the Council acknowledged this, concluding that the evidence "demonstrates a fundamental lack of understanding of the law." The court ultimately concluded that the Council "may be equating a lack of understanding of the law with a lack of respect for the law," but they are not necessarily the same thing.

We agree with the superior court's analysis. Maxwell's testimony aligns with the observation, repeated by all three decision-makers, that he was "not a sharp operator" and by the time of the hearing still failed to understand the relevant law, in large part because of his misinterpretation of the judge's remarks about his PFD eligibility at his criminal trial. Although the Council dismissed Maxwell's alleged reliance on those remarks, it did observe that they "could be interpreted" as addressing Maxwell's residency and eligibility. The Council did not find that Maxwell willfully misinterpreted the judge's remarks, only that a reasonable person with police training *should have* better understood them. A finding that a person with police training *should* understand the law is not a finding that Maxwell in fact *did* understand it. While his failure to understand the law governing his conduct is disturbing and perhaps a reason to find him unsuited for police work, it is not the same as dishonesty or disrespect for the law.

We therefore conclude that the Council's findings do not meet the substantial evidence standard of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[31]

## V.    CONCLUSION

The superior court's decision to reverse the Council's decision revoking Maxwell's police certificate is AFFIRMED.

---

[31]    *Odom v. State, Div. of Corps*, 421 P.3d 1, 6 (Alaska 2018) (quoting *Storrs v. State Med. Bd.*, 664 P.2d 547, 554 (Alaska 1983)).

STOWERS, Justice, dissenting.

A police officer in the State of Alaska is required to be "of good moral character" in order to possess a police certificate authorizing that officer to perform law enforcement duties.[1] The Alaska Police Standards Council has promulgated a regulation defining "good moral character":

> the absence of acts or conduct that would cause a reasonable person to have substantial doubts about an individual's honesty, fairness, and respect for the rights of others and for the laws of this state and the United States.[2]

Valent Maxwell was a police officer employed by the City of Klawock police department. He twice resigned from his job as a Klawock police officer, first taking a job as a law enforcement officer in Fairview, Montana, and then taking a job as chief of police in Ronan, Montana. In each instance — after quitting his job in Fairview and after being fired as chief of police in Ronan — Maxwell returned to the Klawock police department to again work as a police officer. Notwithstanding his having left the State of Alaska and having accepted full-time, permanent employment in Montana in 2012 and 2013, he applied for Alaska Permanent Fund Dividends (PFDs) for 2013 and 2014, certifying on his applications that he had been a resident of Alaska for the full preceding years and had not claimed residency in any other state.

Governing regulations list circumstances that will make a person ineligible for a dividend, including maintaining "the individual's principal home in another state" and "accept[ing] full-time, permanent employment in another state."[3] The Police

---

[1] 13 Alaska Administrative Code (AAC) 85.010(a)(3) (2019).

[2] 13 AAC 85.900(7).

[3] 15 AAC 23.143(d)(1), (4) (2020).

-18-                                                                7458

Standards Council initiated administrative proceedings against Maxwell alleging he had violated these PFD regulations by falsely claiming he was an eligible Alaska resident when he applied for the two PFDs and thereby had demonstrated he lacked the good moral character necessary to maintain his police certificate; the Council sought to revoke his certificate.

At a hearing before an administrative law judge (ALJ) on the Council's accusation, Maxwell testified that when he applied for the PFDs he believed his statements that he was an Alaska resident were true. Of particular significance to this appeal, he also testified that he *still* believed these statements were true. He further testified, "[G]iven what I know today, I would not change a thing as far as those [PFD] applications are concerned," and "[A]bsolutely, I would do the same thing all over again." As discussed below, the Council later found that this testimony demonstrated that Maxwell did not respect the law of the state and lacked the good moral character necessary to hold a police certificate.

The ALJ found that it was undisputed that Maxwell had "[m]aintained a primary home in another state" and "[a]ccepted full-time permanent employment in another state." The ALJ also concluded that Maxwell "was not eligible for the 2013 or 2014 PFDs." The ALJ ultimately concluded, however, that the Council had failed to prove that Maxwell lacked sufficient good moral character to hold a police certificate. The ALJ explained in part that unless a PFD applicant reviewed the PFD regulations, he might not realize he could lose his residency and PFD eligibility by taking a job in another state.

The Council disagreed with the ALJ's ultimate conclusion. The Council found that Maxwell's "continued belief in an inaccurate interpretation of the law in his testimony that he would do the same thing again" demonstrated "trickery[,] because he knows now that the application does not disclose his absences." The Council explained,

"The facts of this case, when taken as a whole, lead to a substantial doubt about Officer Maxwell's honesty and respect for the law." The Council concluded that Maxwell's hearing testimony "demonstrate[d] a fundamental lack of understanding of the law, and more importantly, a lack of respect for the law." The Council revoked Maxwell's police certificate. Maxwell appealed to the superior court, which reversed the Council's decision. The Council appealed to this court, and the court today affirms the superior court. I disagree with the court's opinion and respectfully dissent.

As the court's opinion explains, the standard of review for agency determinations of fact is the substantial evidence standard: we use this standard to examine the factual findings on which the Police Standards Council based its "moral character" determination.[4] "Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] The court's opinion explains:

> While this is a deferential standard, we will "review the entire record to ensure that the evidence *detracting* from the agency's decision is not *dramatically* disproportionate to the evidence supporting it such that we cannot 'conscientiously' find the evidence supporting the decision to be 'substantial.' " The standard is intended to acknowledge a "professional board's special competence in recognizing violations of professional standards" while preventing the "imposition of reputationally and economically damaging professional sanctions based on evidence that would not

---

[4]     Op. at 12 (citing *Much v. Alaska Police Standards Council*, No. S-16225, 2018 WL 1779323, at *6 (Alaska Apr. 11, 2018); *Alaska Police Standards Council v. Parcell*, 348 P.3d 882, 886 (Alaska 2015)).

[5]     *Odom v. State, Div. of Corps.*, 421 P.3d 1, 6 (Alaska 2018) (quoting *Storrs v. State Med. Bd.*, 664 P.2d 547, 554 (Alaska 1983)).

permit a reasonable mind to reach the conclusion in question."[6]

My disagreement with the court is that the court does not apply the substantial evidence standard appropriately. The court fails to give any deference to the Alaska Police Standards Council but instead reweighs the evidence the Council determined in its professional judgment was adequate to show Maxwell lacked good moral character. I agree with the Council that its decision to revoke Maxwell's police certificate should be upheld as an exercise of the Council's expertise and policy judgment in an area falling "squarely within the Council's statutorily delegated authority." I conclude that Maxwell's testimony — that he continued to believe that he was an eligible Alaska resident qualified to apply for the 2013 and 2014 PFDs and that with knowledge that he was not eligible to apply for the PFDs he would do the same thing again — provides at least substantial if not compelling evidence that he does not respect the law of the state. By the time he gave his testimony he was aware of the Council's legal argument, which correctly analyzed the law regarding his ineligibility to apply for the PFDs. The inescapable legal conclusion is that Maxwell was not eligible to apply for the 2013 and 2014 PFDs. When a police officer actually learns what the law is yet persists in declaring that he would "do the same thing again" — that is, file PFD applications falsely stating that he was an eligible Alaska resident — there can be no doubt that he does not accept and respect the law.

The court, however, agrees with Maxwell's argument that the Council's decision was "dramatically disproportionate" to the evidence supporting it. The court explains: "We agree with his argument to this extent: the evidence disproportionately

---

⁶ Op. at 13 (emphasis in original) (footnotes omitted) (first quoting *Shea v. State, Dep't of Ret. & Benefits*, 267 P.3d 624, 635 n.40 (Alaska 2011); then quoting *Odom*, 421 P.3d at 6).

supports a finding that Maxwell still did not understand the law at the time he gave his problematic hearing testimony."[7] The court says: "While his failure to understand the law governing his conduct is disturbing and perhaps a reason to find him unsuited for police work, it is not the same as dishonesty or disrespect for the law."[8]

At bottom, the court's conclusion rests on the faulty reasoning that ignorance of the law or a mistaken belief about what the law provides is an excuse for violating the law. But ignorance of the law or a mistake about what the law requires is not an excuse, and especially so once the law has been positively revealed.[9]

The court's decision also creates bad policy and threatens to undermine the public's respect for the courts and police officers. From a policy perspective the court's decision incentivizes willful ignorance and creates a disincentive to learn the law. It may lead to fraudulent PFD applications based on false claims of ignorance or mistake of law, which would be difficult if not impossible to prove.[10] From a public respect-of-justice perspective, the public rightly expects that police officers, who are charged with knowing and following the law, will be held accountable when they violate the law, and that the courts will hold them accountable. When the agency charged with upholding police standards concludes that a police officer does not have good moral character and

---

[7]    Op. at 15.

[8]    Op. at 16.

[9]    *See, e.g.*, *Stoner v. State*, 421 P.3d 108, 111 (Alaska App. 2018) (holding that the mistake of law defense "is not available to people who form their own mistaken opinion about the law").

[10]    "Ignorance of the law is no excuse for breaking it. This substantive principle is sometimes put in the form of a rule of evidence, that every one is presumed to know the law. It has accordingly been defended . . . on the ground of difficulty of proof." OLIVER WENDELL HOLMES, THE COMMON LAW 40-41 (Mark DeWolfe Howe ed., Little, Brown & Company 1963) (1881).

demonstrates disrespect for the law and there is evidence — the officer's own testimony — to support that conclusion; when the ALJ found Maxwell's testimony was "troubling"; and when this court finds Maxwell's failure to understand the law "disturbing and perhaps a reason to find him unsuited for police work";[11] the public may well question why the courts are laboring to minimize the most substantial evidence of all: Maxwell's own sworn testimony and demonstrated defiance of the law. "I would do the same thing all over again." All of the other evidence the court recites pales in the light of Maxwell's testimony, and I cannot fathom how the court concludes this other evidence "dramatically" and "disproportionately" detracts from this damning testimony.

I contend the Police Standards Council reasonably concluded that Maxwell demonstrated, at the least, disrespect for the law, and therefore a lack of good moral character. I find there is more than substantial evidence to support the Council's decision. I do not find that there is disproportionate evidence that counters the Council's determination. Thus, I would reverse the superior court and affirm the Police Standards Council's revocation of Maxwell's police certificate.

---

[11]     Op. at 16.